UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

E-ONE, INC. and REV GROUP, INC.,

        Plaintiffs,

v.                             CASE No. 8:18-cv-617-T-30TGW

PIERCE MANUFACTURING, INC.,

        Defendant.

_____

PIERCE MANUFACTURING, INC.,

        Plaintiff,

v.                             CASE No. 8:18-cv-976-T-30AEP

REV GROUP, INC. and E-ONE, INC.,

        Defendants.

_____

REPORT AND RECOMMENDATION

        In this patent case, the plaintiff seeks a preliminary injunction prohibiting the defendants from selling their version of a quint fire apparatus that it contends infringes two of the plaintiff's patents.[1]  For the following

_____

[1]For ease of reference, Pierce Manufacturing, Inc., will be referred to as the plaintiff and REV Group, Inc., and E-One, Inc., as the defendants.  The original case was filed by Pierce Manufacturing, Inc., with its motion for preliminary injunction in the United States

reasons, I recommend that the plaintiff's Motion For a Preliminary Injunction (Doc. 6) be granted.

I.

The plaintiff, Pierce Manufacturing, Inc. ("Pierce"), and defendant, E-One, Inc. ("E-One"), are competitors and custom manufacturers of fire apparatus (Dec. Lisa Barwick, Doc. 18, p. 1, ¶4; Dec. James Salmi, Doc. 26, p. 1, ¶6).[2] E-One is a subsidiary of defendant REV Group, Inc. ("REV Group"), with REV Group at least providing corporate marketing support for E-One (Dec. Amanda Patek, Doc. 25, p. 2, ¶6; Dec. James Salmi, Doc. 26, p. 1, ¶3).[3]

Pierce has been in the business of building fire apparatus since 1913 (Dec. Lisa Barwick, Doc. 18, p. 1, ¶4). Currently, Pierce builds various

---

District Court, Eastern District of Wisconsin, Green Bay Division (see Doc. 1 in 8:18-cv-976-T-30TGW). After the original case was transferred to this district, it was merged with the case filed in this district by the defendants.

[2]Citation to the record corresponds to the page numbers in CM/ECF. Citations are found in case number 8:18-cv-976-T-30TGW, unless otherwise noted.

[3]Pierce is incorporated under the laws of Wisconsin and has its principal place of business in Appleton, Wisconsin (Dec. Lisa Barwick, Doc. 37, p. 1, ¶4). Pierce is a subsidiary of the Oshkosh Corporation. See www.piercemfg.com. REV Group is a Delaware company and has headquarters in Milwaukee, Wisconsin and Miami, Florida (Dec. Amanda Patek, Doc. 25, p. 1, ¶2). E-One also is a Delaware Company and has its primary place of business in Ocala, Florida (Dec. James Salmi, Doc. 26, p. 1, ¶2).

custom trucks that include aerials, pumpers, tankers, and rescue units (id.).[4] Pierce also custom builds fire apparatus known as quints. A quint fire apparatus is a combination of an aerial and a pumper with the traditional five features of a water tank, pump, fire hose and ladder storage, ground ladders, and an aerial device (id., p. 3, ¶10; see also Doc. 38, p. 6, ¶29 in 8:18-cv-617-T-30TGW). According to the plaintiff, quints "are popular among [fire] departments smaller in size or with budget constraints" because "the trucks contain all the features needed to respond to fire and emergencies" (Doc. 15, p. 8).

Pierce explains that purchasers of aerial apparatus consider two items, the rated tip load of the aerial ladder and its reach (Dec. Lisa Barwick, Doc. 18, p. 2, ¶6). A ladder's reach is measured vertically and horizontally (id., p. 2, ¶7). The vertical reach is measured on how high the ladder can go, whereas the horizontal reach is how far away from the truck the ladder is when it is extended parallel to the ground (id.). Further, an aerial apparatus's tip load is the amount of "weight the aerial device can support at its tip when

---

[4]"A pumper is an apparatus designed to combat structural and other fires," and "pumpers have a permanently mounted fire pump, a water tank, and hose body" (Dec. Lisa Barwick, Doc. 18, p. 1, ¶5). "Aerials are used to allow fire crews to access positions that are otherwise inaccessible via ground ladders ... and may also be used to discharge water from an elevated position above a fire" (id., p. 2, ¶5). Aerials have "an aerial ladder, elevating platform, or water tower" (id., pp. 1-2, ¶5).

the ladder is fully extended without causing the truck to tip over" (id., p. 3, ¶9). The more tip load an aerial device has, the more weight the extended ladder can hold without tipping over. For example, Pierce explains that when an aerial apparatus has a 500-pound tip load, it can support one firefighter and one rescued person (id.). However, an aerial apparatus with a 750-pound tip load can hold two firefighters and one rescued person on an extended ladder (id.).

Pierce indicates that it was the first manufacturer to build its revolutionary Ascendant 107' and 110' quints that had the configuration "to provide a ladder reaching greater than 95 feet vertically and 90 feet horizontally, with a tip load capable of holding three people (i.e., 750 pounds), and a water tank capacity [of] 500 gallons, all on a single axle" (id., p. 6, ¶17). Pierce explains it developed the Ascendant quint "to overcome the shortcomings of other single rear axle apparatus ... with a single rear axle and an aerial device as long as or longer than those previously available on a tandem rear axle" (id., ¶16). Accordingly, the various benefits of a single rear axle on a fire apparatus are "maneuverability, less maintenance, and lower maintenance costs" (id., ¶15).[5] According to Pierce, it is able to charge on

---

[5]Pierce explains that "single axle trucks are more maneuverable because they weigh less, are shorter, and also have less tail swing due to the reduced length" (Dec. Lisa

average ▮▮▮▮ more for its Ascendant quint in comparison to its other similar aerials "due to its innovative features" (id., ¶18).[6] Pierce indicates that its Ascendant 107' Single Axle Quint is its "most popular apparatus in [its] more than 100-year history, and has generated significant profits for Pierce and its dealers" (Doc. 15, p. 10).

"Pierce debuted the Ascendant 107' Single Axle Quint at the 2015 FDIC International trade show in Indianapolis, Indiana" (id., p. 9; Dec. Lisa Barwick, Doc. 18, p. 8, ¶22). According to Pierce, this trade show is attended by major fire truck manufacturers, fire truck dealers, and representatives from fire stations across the entire country (Dec. Lisa Barwick, Doc. 18, p. 8, ¶22). Pierce continued to displayed its Ascendant 107' Single Axle Quint at other major trade shows in Indiana, Georgia and Texas (id., p. 9, ¶22).[7]

---

Barwick, Doc. 18, p. 6, ¶15). These types of trucks not only cost less initially due to the single rear axle, but there are lower long-term maintenance costs (id.). Consequently, the trucks have fewer parts that have mechanical breakage and wear, including rotors, brakes, and tires (id.).

[6] Pierce indicates that it receives higher margins on the sale of the Ascendant quints because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dec. Lisa Barwick, Doc. 18, pp. 6-7, ¶18).

[7] Pierce claims that at one of the trade shows, "Jim Salmi, E-One's Director of Aerial Product Development, walked around and inspected the Ascendant 107' Single Axle Quint," and that it has "[p]hotographs of Mr. Salmi inspecting (and taking pictures of) the Ascendent 107' Single Axle Quint" (Dec. Lisa Barwick, Doc. 18, pp. 9-10, ¶23). However, it is unclear when the pictures of Mr. Salmi were taken.

Pierce claims that "[a]pproximately two years after [its] introduction of the Ascendant, REV/E-ONE announced the Metro 100 Quint," and that the defendants' marketing of the truck "highlights the same features as Pierce does when selling its Ascendant Quint Single Axle, including the long reach ladder on a single axle" (id., pp. 10-11, ¶24). Pierce explains that the defendants' Metro 100 Quint directly competes and infringes upon two patents concerning its Ascendant Single Axle Quint (Doc. 15, p. 11). Pierce submits that its company and the defendants are the only manufacturers in the industry of a fire apparatus on "a single axle quint configuration ... with an aerial ladder with a vertical reach greater than 95 feet and a horizontal reach greater than 90 feet" (id.).

As indicated, the plaintiff has two patents for its Ascendant quint. The plaintiff's United States Patent No. 9,597,536, is titled "Quint Configuration Fire Apparatus" (the "'536 Patent") and was issued by the United States Patent and Trademark Office on March 21, 2017 (Doc. 1, p. 6, ¶¶21, 23). The plaintiff's United States Patent No. 9,814,915, is titled "Quint Configuration Apparatus" (the "'915 Patent") and was issued by the United States Patent and Trademark Office on November 14, 2017 (id., p. 6, ¶21, p.

-6-

7, ¶25).[8] The plaintiff contends that these patents solve the problems of fire apparatus with two rear axles with heavier weights — i.e., lack of maneuverability and higher manufacturing expenses (id., p. 6, ¶22). Thus, Pierce claims its patents solve these problems with "a quint configuration fire apparatus that has a single rear axle, but without compromising other aspects of the truck's performance" (id.). The plaintiff also explains that it is the "exclusive licensee of all rights, title, and interest in and to the 536 [and 915] Patent[s] and holds the right to sue and recover damages for infringement thereof, including past damages" (id., p. 7, ¶24).

According to the plaintiff, the defendants' Metro 100 infringes claim 20 of both the '536 and '915 patents (Doc. 15, pp. 14-15). The plaintiff explains that claim 20 of the patents relates to the quint configuration of a fire apparatus (id.). Claim 20 of the '536 patent states (Doc. 1-5, p. 32):

> 20. A quint configuration fire apparatus, comprising:
> a chassis;
> a body assembly coupled to the chassis and having
>     a storage area configured to receive a ground
>     ladder and a fire hose;
> a pump coupled to the chassis;
> a water tank coupled to the chassis;

---

[8]With respect to the patents, the plaintiff explains that the "Oshkosh Corporation has licensed the patents-at-issue only to Pierce, and wishes to maintain its monopoly on the technology" (Dec. Lisa Barwick, Doc. 18, p. 13, ¶34).

a ladder assembly including a plurality of extensible ladder sections, the ladder assembly having a proximal end that is coupled to the chassis;

a single front axle coupled to a front end of the chassis; and

a single rear axle coupled to a rear end of the chassis,

wherein the single rear axle comprises either: a single solid axle configuration extending laterally across the chassis, or a first axle having a first constant velocity joint and a second axle having a second constant velocity joint, the first axle and the second axle extending from opposing lateral sides of a differential;

wherein the ladder assembly is extensible to provide a horizontal reach of at least 90 feet and a vertical height of at least 95 feet, wherein the ladder assembly is configured to support a tip load of at least 750 pounds, and wherein the center of gravity of at least one of the chassis, the body assembly, the pump, and the water tank are positioned to counterbalance a moment generated by the tip load with the ladder assembly extended to the horizontal reach of at least 90 feet.

The plaintiff further explains that "[c]laim 20 of the '915 [p]atent is nearly identical [to the '536 patent] but removes the requirement that 'the ladder assembly be configured to support a tip load of at least 750 pounds'" (Doc. 15, p. 15; see also Report of Dr. Thomas Kurfess, Doc. 13, p. 45, ¶145). The plaintiff argues that the defendants' Metro 100 Quint infringes upon both

patents because it "has a chassis, with the required features coupled to that chassis: a body assembly with a storage area for ground ladders and fire hose; a pump; a water tank; and a ladder assembly with a plurality of extensible ladder sections" (Doc. 15, p. 15). The plaintiff further explains that "the Metro 100 Quint also has a single front axle coupled to the front end of the chassis, and a single rear axle coupled to the rear end of the chassis" (id., p. 16). The plaintiff continues that the Metro 100 "satisf[ies] the[] [ladder] limitations" because it has "a horizontal reach of 92 feet and a vertical height of 100 feet," and that it "can support a tip load of at least 750 pounds" (id., pp. 17, 18).[9] Further, "Pierce's Ascendent Single Axle Quint and Defendants' Metro 100 Quint are in direct competition, and no other products currently on the market offer the combination of features claimed in the 536 and 915 Patents" (id., p. 23).

According to E-One, it "is an industry leader in the engineering, manufacture, and sale of fire engines" (Doc. 44, p. 13).[10] The defendants

---

[9]The plaintiff explains that the defendants' Metro 100 Quint can be equipped "with at least two different ladders, an HR100 and an HM100, both of which provide the vertical and horizontal reach recited in the claims" (Doc. 15, p. 17). The plaintiff contends that a Metro 100 Quint "equipped with the HR100 ladder satisf[ies] [the reach] limitations" (id.). The plaintiff states that a "Metro 100 Quint[] equipped with the HM100 ladder also satisf[ies] these limitations" (id., p. 18).

[10]E-One has two manufacturing facilities, one in Ocala, Florida, and one in Hamburg, New York (Dec. James Salmi, Doc. 26, p. 1, ¶6). E-One explains that its aerial

explain that E-One is a subsidiary of REV Group. It is the defendants' position that REV Group "does not design, manufacture, sell, or offer for sale vehicles of any type" (id.; Dec. Amanda Patek, Doc. 25, pp. 1-2, ¶¶3-5). Rather, REV Group "provides corporate marketing support for all of its brands, including E-One" (Dec. Amanda Patek, Doc. 25, p. 2, ¶6).

In April 2017, E-One introduced its quint model fire engine, the Metro 100 Quint, at the FDIC International Exhibition trade show in Indianapolis, Indiana (Doc. 1, p. 7, ¶30; Doc. 44, p. 13). As indicated, the plaintiff contends that the defendants' Metro 100 Quint fire engine infringes its '536 and '915 patents (see Doc. 1). The defendants submit, among other contentions, that their Metro 100 Quint does not infringe the patents "under a plain English meaning of terms of the patents ... because it lacks the 95 foot vertical height and the 90 foot horizontal reach" (Doc. 44, p. 38). The defendants further contend that the Metro 100 Quint "does not infringe claim 20 of the '536 Patent because it lacks a 750 lb. tip load" (id.). The defendants do not indicate they hold any patents with respect to the Metro 100 Quint fire engine. The defendants continue to display the Metro 100 Quint at various

_____

products, including the Metro 100 Quint, are manufactured in Ocala, Florida (id.). Also, E-One has its headquarters in Ocala, Florida (id., ¶3).

trade shows and also have sold this model in the United States and Canada (Supp. Dec. James Salmi, Doc. 48, p. 1, ¶3, p. 2, ¶6).

"[O]n June 13, 2017, Pierce sent a letter to E-One informing [d]efendants that [the] 'promotion and sale of the Metro 100 Quint fire apparatus infringes one or more claims of our Ascendant patents, including at least Claim 20 of U.S. Patent No. 9,597,536'" (Doc. 1, p. 9, ¶33).[11] According to the plaintiff, despite its letter the defendants continued to market for sale the Metro 100 Quint fire apparatus (id., pp. 9-13, ¶¶33-39).

Thereafter, on February 23, 2018, the plaintiff filed a Complaint against the defendants in the United States District Court for the Eastern District of Wisconsin (Doc. 1). The plaintiff's complaint asserts a cause of

---

[11]In a letter dated June 13, 2017, Mike Moore, the plaintiff's Chief Operating Officer, wrote to Jim Salmi, E-One's Director of Aerial Product Development, regarding Pierce's position that the Metro 100 Quint fire apparatus is infringing upon its patent, in particular claim 20 of the '536 patent (Doc. 1-1, Ex. A, p. 2, in 8:18-cv-617-T-30TGW). The letter states, "[a]t the [FDIC] show, we noticed E-One's promotion of the Metro 100 Quint fire apparatus sold to the Sarasota County Fire Department" (id.). The letter continues, "[o]ur belief is that E-One's promotion and sale of the Metro 100 Quint fire apparatus infringes one or more claims of our Ascendant patents, including at least Claim 20 of U.S. Patent No. 9,597,536" (id.). Moore requests E-One to "review [Pierce's] patent portfolio and provide a substantive response to [Pierce's] concerns" (id.). The letter also indicates that if E-One "would rather [have Pierce] conduct this analysis, please provide [Pierce] with details of [E-One's] Metro 100 Quint fire apparatus" (id.).

In its Amended Complaint, Pierce indicates that "REV Group also had actual knowledge of the 536 Patent as of at least June 13, 2017, as E-One and REV Group share a general counsel – Pamela Krop" (Doc. 38, p. 16, ¶59, in 8:18-cv-617-T-30TGW). Pierce explains that "Ms. Krop, in her role as General Counsel of REV Group, was copied on the June 21, 2017 letter from E-One to Pierce regarding Pierce's allegations of infringement (Exhibit 9)" (id., ¶60).

action under the patent laws of the United States, 35 U.S.C. 1, et seq. (id.). The plaintiff asserts in Claim 1 "Infringement of the 536 Patent" and in Claim 2 asserts "Infringement of the 915 Patent" (id., pp. 13-15). Each claim asserts that the defendants "directly infringe at least claim 20" of both patents (id., p. 13, ¶41, p. 14, ¶49). With respect to both claims, the plaintiff contends the defendants infringe both patents because they "mak[e], us[e], sell[], and/or offer[] to sell within the United States [d]efendants' quint configuration fire apparatus including, but not limited to, the Metro 100 Quint" (id., p. 13, ¶42, p. 15, ¶50). For both claims, the plaintiff seeks damages of "a reasonable royalty under 35 U.S.C. § 284" (id., p. 14, ¶47, p. 15, ¶53). The plaintiff also requests preliminary and permanent injunctions "enjoining [d]efendants from continuing to make, use, sell, and/or offer to sell the products accused of infringing" both patents (id., p. 17, ¶57). The plaintiff further seeks "damages, costs, expenses, []pre-judgment and post-judgment interest" for both patents under 35 U.S.C. 284 (id., p. 16, ¶57). The plaintiff also requests "supplemental damages for any continuing post-verdict or post-judgment infringement" (id.). The plaintiff asks that the defendants' infringement be declared willful and requests an award of a treble damages under 35 U.S.C. 284 (id.).

On the same day as the filing of its complaint, the plaintiff filed a motion for preliminary injunction with a supporting memorandum (Docs. 6, 7). The plaintiff's motion for preliminary injunction seeks to "preclud[e] [d]efendants REV Group, Inc., and E-One, Inc., from making, using, selling, and offering to sell fire apparatuses that infringe Pierce's U.S. Patents Nos. 9,597,536 and 9,814,915" (Doc. 6, p. 1).

Thereafter, on March 15, 2018, the defendants filed a Motion to Dismiss and/or Transfer Complaint to the Middle District of Florida with a supporting brief (Docs. 22, 23). On April 5, 2018, the plaintiff filed its response to the defendants' motion to dismiss and/or to transfer the case (Doc. 39). Subsequently, on April 9, 2018, the defendants filed their opposition brief to the plaintiff's motion for preliminary injunction (Doc. 44). On April 18, 2018, the plaintiff filed its reply brief to the defendants' opposition brief (Doc. 55). On April 19, 2018, the defendants filed a reply brief in support of its motion to dismiss and/or to transfer the case (Doc. 67).

On April 20, 2018, a hearing was held in the United States District Court, Eastern District of Wisconsin, before Chief United States District Judge William C. Griesbach, regarding the plaintiff's motion for preliminary injunction and the defendants' motion to dismiss (Doc. 72). On

-13-

that same day, Chief Judge Griesbach entered an Order Transferring Case to this court (Doc. 73). Chief Judge Griesbach concluded, "[f]or the reasons expressed on the record in today's hearing, the Court finds that the Eastern District of Wisconsin is an improper venue for both E-ONE Inc. and REV Group Inc. under 28 U.S.C. § 1400(b)" (id.). He further held, "[i]n the interests of justice, pursuant to 28 U.S.C. § 1406(a), the Court shall transfer this case to the Middle District of Florida, where parties are currently engaged in litigation" (id.). Consequently, Chief Judge Griesbach granted the defendants' motion to dismiss and/or transfer and denied as moot the plaintiff's motion for a preliminary injunction (id.). On the same day, the case was transferred to this court (Doc. 74).

In the meantime, on March 14, 2018, E-One and REV Group filed a Complaint against Pierce in this court (see Doc. 1, 8:18-cv-617-T-30TGW). The Complaint includes five counts titled as follows: Count I - Florida Patent Troll Prevention Act; Count II - Declaratory Judgment on Non-Infringement by E-One ('536 Patent); Count III - Declaratory Judgment of Non-Infringement by E-One ('915 Patent); Count IV - Declaratory Judgment of Non-Infringement by REV Group ('536 Patent); and Count V - Declaratory Judgment of Non-Infringement by REV Group ('915 Patent) (id.). Among

-14-

other relief, E-One and REV Group seek declaratory relief that E-One's products "ha[ve] not, do[] not, and will not infringe, directly or indirectly, any claim of the '536 Patent and the '915 Patent" (id., p. 13). E-One and REV Group also seek "actual damages, in the form of attorneys' fees and costs incurred in evaluating the patents identified in the demand letter; [] punitive damages; and [] costs and fees, including reasonable attorney's fees, incurred in the prosecution of this claim" (id.).

Thereafter, on April 25, 2018, the parties filed a Joint Motion for Consolidation and Transfer (Doc. 79).   The parties requested that the transferred case from Wisconsin be consolidated with the case that E-One and REV Group filed in the Middle District of Florida, case number 8:18-cv-617-T-30TGW (id.). On May 2, 2018, District Judge James S. Moody, Jr., entered an Order granting the parties' motion and the cases were consolidated (Doc. 83). Consequently, case number 8:18-cv-976-T-30AEP was reassigned to me and the case was administratively closed (id.). Also, the plaintiff's motion for a preliminary injunction filed in that case was reinstated and referred to me for a report and recommendation (id.). Thereafter, a hearing was held on the matter in which the parties presented oral argument (Doc. 86).

Pierce filed an Amended Complaint on June 5, 2018 (Doc. 38, 8:18-cv-617-T-30-TGW).  In general, Pierce sets forth the same claims as in its original complaint, but with more detail.  Thus, the Amended Complaint asserts four claims: Claim 1 (Infringement of the '536 Patent by E-One); Claim 2 (Infringement of the '536 Patent by REV Group); Claim 3 (Infringement of the '915 Patent by E-One); and Claim 4 (Infringement of the '915 Patent by REV Group) (id., pp. 16-23).[12]  Pierce seeks various relief, including preliminary and permanent injunctions; damages in an amount of a reasonable royalty from the defendants' sales; attorneys' fees; costs; expenses; and an order declaring the defendants' infringement willful, thereby entitling Pierce to treble damages  (id., pp. 23-26, ¶104).

It is the plaintiff's position in its motion for a preliminary injunction that the defendants, who are direct competitors of the plaintiff, are marketing and selling the Metro 100 Quint fire apparatus that infringes upon the plaintiff's '536 and '915 patents on its Ascendant Single Axle Quint (Doc. 15).  The plaintiff, therefore, argues that a preliminary injunction is necessary

---

[12]Pierce also adds that the defendants infringe Claim 1 of the '536 and '915 patents (Doc. 38, p. 16, ¶65, p. 18, ¶75, p. 20, ¶87, p. 21, ¶96, in 8:18-cv-617-T-30TGW). However, Pierce's motion for preliminary injunction is based on the defendants' alleged infringement of Claim 20. Therefore, that is the focus of this Report and Recommendation.

to stop the defendants from infringing upon its product, and that it is being irreparably harmed because the defendants are "stealing [an] undeserved market share and customers" (id., p. 7). The plaintiff also contends that the defendants have caused and will continue to cause negative impacts on its dealer network, revenues, and profits, and pricing damage on its fire apparatus (id.).

The defendants have filed an opposition memorandum to the plaintiff's motion for preliminary injunction that contains myriad arguments (Doc. 44). For example, the defendants challenge the plaintiff's motion on the ground that the "[p]laintiff cannot establish a likelihood of success on the merits" because the patents are invalid as anticipated or obvious (id., pp. 20-29). As previously indicated, the defendants also argue that their fire apparatus are not infringing because the aerial ladders do not have the requisite horizontal and vertical length and the trucks do not have a 750-pound tip load. The defendants further submit that the plaintiff "cannot establish irreparable harm" and that its "alleged irreparable harm is quantifiable" (id., pp. 44-59).

II.

A preliminary injunction may be issued when necessary "to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits." The Canal Authority of the State of Florida v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974). The remedy, however, is considered extraordinary and drastic. Traditionally, it may be granted only if the plaintiff clearly shows (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) that its threatened injury outweighs the threatened harm the injunction may cause the opposing party; and (4) that granting the injunction will not disserve the public interest. Id. at 572-73. The motion should ordinarily be denied if the plaintiff fails to meet its burden as to even one of the foregoing prerequisites. United States v. Jefferson County, 720 F.2d 1511, 1519-20 (11th Cir. 1983).

However, "a preliminary injunction enjoining patent infringement pursuant to 35 U.S.C. § 283 involves substantive matters unique to patent law and, therefore, is governed by the law" of the Federal Circuit. Revision Military, Inc. v. Balboa Manufacturing Co., 700 F.3d 524, 525 (Fed.

-18-

Cir. 2012) (internal quotation and citation omitted).   The Federal Circuit

explained the preliminary injunction standard as follows:

> A plaintiff seeking a preliminary injunction must
> establish that [it] is likely to succeed on the merits,
> that [it] is likely to suffer irreparable harm in the
> absence of preliminary relief, that the balance of
> equities tips in [its] favor, and that an injunction is
> in the public interest.

Id., quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

Therefore, the plaintiff must show "whether success is more likely than not"

under the Federal Circuit's standard.   Revision Military, Inc. v. Balboa

Manufacturing Co., supra, 700 F.3d at 526.

Moreover, the "factors, taken individually, are not dispositive;

rather, the district court must weigh and measure each factor against the other

factors and against the form and magnitude of the relief requested."

Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed.

Cir. 2001) (internal quotation and citation omitted). Consequently, "the

weight of the likelihood may be considered as an equitable factor, along with

issues of the position of the parties with respect to the status quo, in the

ultimate balance of equities."   Revision Military, Inc. v. Balboa

Manufacturing Co., supra, 700 F.3d at 526.

A plaintiff in its motion for preliminary injunction must "establish *both* of the first two factors, *i.e.*, likelihood of success and irreparable harm." Vehicular Technologies Corp. v. Titan Wheel International, Inc., 141 F.3d 1084, 1088 (Fed. Cir. 1998). For likelihood of success on the merits, a plaintiff

> must show that, in light of the presumptions and burdens that will inhere at trial on the merits, (1) it will likely prove that [the defendant] infringes [its] patent, and (2) its infringement claim will likely withstand [the defendant's] challenges to the validity and enforceability of the [] patent.

Id.

Additionally, "[i]rreparable harm is presumed when a clear showing of patent validity and infringement has been made." Amazon.com, Inc. v. Barnesandnoble.com, Inc., *supra*, 239 F.3d at 1350. "This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm." Bell & Howell Document Management Products Co. v. Altek Systems, 132 F.3d 701, 708 (Fed. Cir. 1997) (internal quotation and citation omitted).

III.

The determination of whether a preliminary injunction should issue typically begins with the question of whether the plaintiff is likely to succeed on the merits.  The merits here concern the plaintiff's suit alleging that the defendants have infringed claim 20 of its two patents.  Notably, both sides have asserted that no discovery has been undertaken and that factual development could change the perspective of the merits.  In this respect, experts on both sides have indicated their opinions are subject to change.  At this point, however, the plaintiff has demonstrated it is likely to succeed on its claims of patent infringement.  Correspondingly, the defendants' shotgun attack on the patents is presently unconvincing.

The facts of this case have been set forth in detail.  The pertinent facts bearing on the issuance of a preliminary injunction are summarized as follows.

The parties in this case manufacture and sell fire trucks.  Both parties make fire trucks that come in various configurations.  One type of specialized fire truck they each make is called a "quint."  A quint (not surprisingly) has five specific features:  a pump, a water tank, fire hoses, ground ladders, and an aerial device such as an extendable ladder platform.

In 2015, the plaintiff introduced a single-axle quint which had a ladder that could reach greater than 95 feet vertically and 90 feet horizontally and could hold 750 pounds at its tip. The single axle provided increased maneuverability and reduced maintenance costs over a tandem-axle quint. Further, the length of the ladder and the weight it could hold was an improvement over existing single-axle quints.

The plaintiff sought patents on its new quint. In March 2017, the plaintiff received patent number 9,597,536 (the "'536 patent") and in November 2017 received patent number 9,814,915 (the "'915 patent"). The plaintiff alleges that the defendants have infringed claims 20 of each of those two patents.

The difference in the two claims is that the '536 patent includes language that "the ladder assembly be configured to support a tip load of at least 750 pounds," while the '915 patent does not.

In April 2017, the defendants introduced a fire truck called the Metro 100 Quint. It is that product that the plaintiff alleges infringes its patents.

In support of the claim of infringement, the plaintiff has submitted an expert report of Dr. Thomas Kurfess, a professor of mechanical

engineering at Georgia Tech.  Dr. Kurfess explains in great detail why the defendants' Metro 100 Quint infringes claim 20 of each of the plaintiff's two patents (Doc. 13, pp. 24-51; see also Docs. 13-1, 13-2).  Thus, Dr. Kurfess opines that the Metro 100 Quint meets all of the limitations of the '536 and '915 patents.

In response to Dr. Kurfess's expert report, the defendants have filed two expert reports, one by Dr. Craig Forest, an associate professor of mechanical engineering at Georgia Tech, and one by Alan Saulsbury, president of Fire Apparatus Consultants.  Outside of the listing of credentials and the terms of engagement, the reports, which are more than one hundred pages in length, appear to be identical.  As the plaintiff points out, each has at footnote 7 an inappropriate reference to the author as "Petitioner" (compare Doc. 49, p. 47 n.7 with Doc. 50, p. 48 n.7).  Under these circumstances, it is uncertain whether the reports were written by Dr. Forest, Saulsbury, or by some lawyer.  Accordingly, the reports should be discounted.  Cf. Cholakyan v. Mercedes-Benz, U.S.A., LLC, 281 F.R.D. 534, 546 (C.D. Cal. 2012).

Furthermore, the defendants' expert reports assert that Dr. Kurfess's opinion on infringement is flawed because it failed to consider the National Fire Protection Association ("NFPA") standards.  Thus, the

-23-

defendants' expert reports assert that a person of ordinary skill in the art would construe the patent claims in light of the NFPA standards, that those standards inform the construction of the patent claims, and that Dr. Kurfess's claim construction did not coincide with those standards.

The plaintiff responds that the NFPA standards are not part of the patent, but are simply extrinsic evidence. Extrinsic evidence is not properly considered if the intrinsic patent materials render the patent claims unambiguous. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582-83 (Fed. Cir. 1996). At this point, there is no indication that the patent claims are ambiguous and that extrinsic evidence, such as the NFPA standards, is needed to assist in the claim construction. Accordingly, a primary basis for the defendants' challenges to Dr. Kurfess's opinion is unavailing.

Under these circumstances, the defendants' twin expert reports are entitled to little weight and do not refute Dr. Kurfess's strong and clear opinion on infringement.

It is appropriate to add, moreover, that the plaintiff caught Jim Salmi, the defendants' director of aerial product development, taking pictures of the plaintiff's quint (see Doc. 15, p. 10). The defendants weakly respond that there is no date when that picture was taken. However, Salmi would

know when it was taken and, if it was not at a time before the defendants produced their quint, Salmi could say so.

Of course, further circumstantial evidence of infringement is that the plaintiff introduced its quint and achieved commercial success two years before the defendants introduced their version.

In light of my conclusion that the defendants' expert reports have not impaired Dr. Kurfess's opinion that the defendants' Metro 100 Quint infringes claim 20 of both of the patents, it is unnecessary to articulate an analysis of those lengthy discussions.

However, there is one aspect of a claim that warrants mention. Patent '536 expressly provides for a ladder assembly "configured to support a tip load of at least 750 pounds." The defendants assert that the Metro 100 Quint only has a tip load of 500 pounds and, therefore, "does not infringe claim 20 of the '536 patent" (Doc. 44, p. 36).

Dr. Kurfess explains that the defendants state that their ladder has a tip load *rating* of 500 pounds. Under the NFPA standards, the ladder must be capable of sustaining a static load 1½ times its *rated* capacity (Doc. 13, p. 39). Therefore, the defendants rated capacity of 500 pounds means that

the aerial ladders on the defendants' quints are configured to support a tip load of 750 pounds.

The defendants also seek to defend the claims of patent infringement on the ground that the plaintiff's patents are invalid. The patents are presumed valid, and the defendants must show invalidity by clear and convincing evidence. Oakley, Inc. v. Sunglass Hut International, 316 F.3d 1331, 1339 (Fed. Cir. 2003). In the context of a preliminary injunction, the party seeking the injunction has the burden of showing that there is a reasonable likelihood that the attack on the patent's validity will fail. Id. At this point, in light of the undeveloped record, the plaintiff has made the required showing.

To start with, as indicated, I have discounted the defendants' expert reports. Moreover, when addressing the issue of prior art, defense counsel began by commenting on the lack of competence of government employees, including patent examiners. That type of comment is unacceptable and unpersuasive. It reflects a weakness of the merits of the defendants' argument.

The defendants claim that the patents are invalid as anticipated or obvious in light of prior art, such as the plaintiff's own disclosures, quints

produced by the Seagrave Fire Apparatus Company, as well as other references. The plaintiff responds that these references were before the patent examiner, were duplicative of art that was before the examiner, or do not disclose what the defendants assert.

The defendants first argue that the plaintiff's claims were publicly disclosed in a June 2010 brochure issued by the plaintiff. The defendants point to various items in the brochure that correspond with each of the limitations in the claims.

The plaintiff responds, however, that the brochure was simply a brochure that lists the general features that were available on Pierce aerials at that time. The brochure does not disclose a single-rear-axle aerial with a 100-foot ladder because such a device did not exist. Thus, the brochure did not anticipate claim 20 of the two patents.

The defendants also assert that their "preliminary invalidity investigation has uncovered evidence that Seagrave Fire Apparatus ... sold single front/single rear axle quints in the 1990s that also anticipate the [a]sserted [c]laims or render them obvious in view of the axle technology available at the time of the purported invention" (Doc. 44, p. 24).

Specifically, the defendants refer to a 1996 Seagrave quint and a 1997 Seagrave quint.

The plaintiff responds that the defendants have submitted no evidence that those two quints contain any of the purported features. This reflects the defendants' acknowledgment that they have only engaged in a "preliminary investigation" of the two Seagrave quints. As previously indicated, the papers regarding the motion for preliminary injunction were filed before any discovery was conducted. Until there has been an inspection of the two Seagrave quints, or some equivalent information is obtained, the defendants' reliance on two pictures to establish anticipation or obviousness is too speculative.

Further, the plaintiff points out that, as shown by the patents, information about the 1996 Seagrave quint was before the patent examiner. However, what the patent examiner could have gleaned from the seemingly limited information about the 1996 Seagrave quint that was before him is not clear.

Under these circumstances, the defendants' argument of invalidity based on the Seagrave quints has not been sufficiently developed.

Accordingly, that contention, at this point, lacks substantial merit. Thus, it would not preclude the entry of a preliminary injunction.

The defendants also assert that there are many other prior art references that anticipate or render obvious the plaintiff's patents, but that page limitations prevent their articulation. However, the failure to develop arguments about those matters warrants discounting them. Seemingly, if the arguments had any persuasive force, the defendants could have made room for them.

The defendants also argue that "[w]hat brought about the development of products that are described by the [a]sserted claims is dependent on a change in law, and the availability of axles with higher rated weight capacities, and not any innovation by Plaintiff or the patentee" (Doc. 44, p. 27). The plaintiff responds that by 1998 it offered single rear axles with the 33,500 pound rating the defendants said had just become available. Further, at the hearing the plaintiff stated that the axle weight restrictions did not limit the use of emergency vehicles, at least in not many states (Doc. 88, p. 115).

In all events, better rear axles and more favorable laws did not make the plaintiff's quints any more obvious. While those circumstances may

-29-

have facilitated the development of the plaintiff's quints, no one else undertook to build a single-axle quint with longer ladders and a higher tip load following those developments.

The short answer to the defendants' assertion of anticipation and obviousness was rendered by Rosenbauer Aerials, LLC, a competitor of both the plaintiff and defendants.  In comparing the plaintiff's Pierce 107' Ascendant and its own 109 Viper, Rosenbauer wrote about the plaintiff's product (Doc. 56-1, p. 3):

> **The Concept They Are Selling, 109' Aerial**
> - 500 gallons of water
> - 750 pound tip load
> - Single rear axle
>
> Five patents pending on the design
>
> Is it a miracle or smoke & mirrors?

Rosenbauer's question demonstrates that claim 20 in both patents was not anticipated or obvious to a person of ordinary skill in the art at the time of the invention.

The defendants also contend that the patents are invalid because they are based on laws of nature (Doc. 44, p. 38).  Thus, the defendants argue that the patents "seek to monopolize the abstract idea of arranging conventional elements in a 100' single-rear-axle quint apparatus, with no

-30-

instruction as to how to arrange these common elements other than applying natural laws of physics" (id., p. 39). In this respect, the defendants apparently focus upon the language in the patents that require a center of gravity positioned to counterbalance a moment generated by the tip load. While that requirement involves a matter of physics, it is not the essence of the inventions. Thus, the plaintiff points out that claim 20 of both patents is directed specifically and concretely to a quint configuration fire apparatus, not laws of nature (Doc. 55, p. 34). Moreover, the patents teach a quint that was unprecedented. Under the circumstances, the plaintiff's innovations were patent eligible.

For those reasons, the plaintiff has shown a likelihood of success on the merits. The showing is not compelling because, due to the lack of discovery, there are gaps or uncertainties in the facts. Further, the parties, especially the defendants, burden the presentations with verbose language and weak claims. But, the plaintiff has shown enough to demonstrate a likelihood of success on the merits.

IV.

A.    The plaintiff acknowledges that in order to obtain a preliminary injunction it must show irreparable harm. It is on this issue that

the plaintiff takes its turn in asserting weak arguments. Thus, the plaintiff asserts that the "harm includes harm to Pierce's dealer network, losses stemming from 'ecosystem' and 'network' effects, the lost sales of non-patented products, eroded prices, impaired ability to invest in the types of research and development activities that have made Pierce successful, and damage to Pierce's reputation" (Doc. 15, p. 22). Except for lost sales of non-patented products, the other alleged harms are vague, speculative, or unshown. However, the plaintiff has demonstrated harm from lost sales of non-patented products. That showing would be enough to support a preliminary injunction.

The plaintiff points out that the parties are direct competitors for the manufacture and sale of a quint that has the features set forth in claim 20 of the patents. That, however, does not justify the issuance of a preliminary injunction. In this respect, the plaintiff acknowledges that money damages will compensate it for sales by the defendants of an infringing product.

The plaintiff, however, has shown by concrete examples, that when it sells its patent-covered quint to a fire department, there is a reasonable likelihood that the fire department will buy other fire apparatus as well. Thus, when the plaintiff sold an Ascendant 107 quint to the Hory (SC)

County Fire Department, they also sold them eight pumpers (Dec. Andrew W. Carter, Doc. 19, pp. 37-38, ¶122). Further, the plaintiff has sold ▮▮ such quints, with ▮▮ of them being sold to new customers (id., p. 38, ¶124). Of those new customers, ▮▮ of them purchased ▮ non-patent apparatus, generating an additional ▮▮▮ dollars in revenue (id., ¶125). If the defendants sell their allegedly infringing quints to customers, the plaintiff's opportunity to make sales of other apparatus to those customers in all likelihood will be lost. Moreover, there is no apparent way to quantify the value of those lost sales. Therefore, if the defendants can sell infringing quints, the plaintiff will suffer irreparable harm due to lost sales of other apparatus.

The other purported irreparable harms are unpersuasive. At the hearing, the plaintiff acknowledged that it has lost no dealers. Moreover, in light of the success of the plaintiff's quint, it is unlikely that any dealers would move on.

Alleged harm from "ecosystem" and "network" effects is purely speculative. The record indicates that there is strong communication among fire departments. Further, the quints are regularly displayed at trade shows (Dec. Lisa Barwick, Doc. 18, p. 9, ¶22). In light of the success of the

plaintiff's new quint, it is not likely that sales will be lost because some fire department has not heard about it.

Also, the claim of price erosion has not been substantiated. Thus, the plaintiff has shown only that at times it will offer a discount on the price of its quints. Those discounts tend to be relatively small and driven by factors such as a municipality's budget limitations. In all events, price erosion could seemingly be calculated and remedied by money damages.

The alleged harm of an impaired ability to engage in research and development has not been shown. In fact, the plaintiff's additional revenues from the sales of the new quints would seemingly support greater research and development. In all events, this contention seems baseless on its face and suggests that the plaintiff is really straining on this issue.

Similarly, the claim of an impairment to the plaintiff's reputation is without merit. This is not a situation where a competitor is passing off an inferior product as the plaintiff's.

In sum, despite the plaintiff making unpersuasive claims of harm, it has shown irreparable harm through lost sales of non-patented products. That is enough to support a preliminary injunction.

The defendants argue that the plaintiff's claim is defeated by a delay of almost ten months in filing this lawsuit (Doc. 44, pp. 42-44). In this respect, the defendants state that the plaintiff became aware of the Metro 100 Quint when it was displayed at an April 2017 trade show and did not file the lawsuit until February 2018.

The plaintiff responds that it sent a demand letter on June 13, 2017, and that the defendants answered that the Metro 100 Quint avoids the '536 patent because it only has a tip load of 500 pounds, and a tip load of 750 pounds was an element of the '536 patent, which was the only patent that had been issued at that time (Doc. 55, pp. 38-39). The '915 patent, which does not have the 750-pound tip load limitation, was not issued until November 14, 2017, and the plaintiff sued three months later.

Further, the plaintiff states that it began investigating the Metro 100 Quint in June 2017 and it took time to get information regarding the defendants' sales and sales pitches. And, in fact, some of the information the plaintiff did get was not accurate (see Supp. Dec. Michael Dufrane, Doc. 57, p. 2, ¶¶6-7).

Also, the plaintiff has submitted voluminous submissions in support of its motion for a preliminary injunction. Those submissions would take a substantial amount of time to prepare.

Therefore, the defendants' contention that the plaintiff took an unreasonable time to file this lawsuit with the accompanying motion for preliminary injunction is unpersuasive.

B.     Neither party has made a strong argument on the issue of balance of harms. The plaintiff's opening brief does not even acknowledge any harm that will be suffered by the defendants as a result of a preliminary injunction (see Doc. 15, pp. 29-30). The defendants simply respond that fire departments typically use formal purchasing processes that tend to be lengthy so that a preliminary injunction will have a negative impact beyond the life of the case (Doc. 44, pp. 59-60). At the hearing, the defendants were pressed to provide specific, concrete examples of harm they would suffer if the preliminary injunction were issued, and they failed to do so.

Moreover, the accused product is the Metro 100 Quint (Supp. Dec. James Salmi, Doc. 48, p. 2, ¶5). The defendants also sell an apparatus simply named a Metro 100 (id.). That fire truck has a 100-foot aerial, but does not have a pump and water tank, so that it is not a quint (id.). The

defendants have been successfully selling that product and can continue to sell it even if a preliminary injunction is entered. This circumstance ameliorates any harm the defendants would suffer from a preliminary injunction. Consequently, the balance of harms favors the plaintiff.

      C.    The final factor in determining whether a preliminary injunction should issue is the public interest. The public interest favors the protection of patent rights. Thus, the Federal Circuit has said that "[w]e have long acknowledged the importance of the patent system in encouraging innovation." Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383 (Fed. Cir. 2006).

      The defendants assert that the public interest in safety supports denial of the preliminary injunction (Doc. 44, pp. 60-61). The defendants, however, have not made a cogent argument in support of that assertion. Thus, they fail to explain why the plaintiff's quint and the myriad apparatus that are available from the defendants and other manufacturers are not adequate to permit safe fire-fighting operations. In fact, until last year, the defendants Metro 100 Quint was not available for fire-fighting and there is no reason to think that the operations before that point were any more unsafe than they would be if the sale of the Metro 100 Quint is enjoined. Fire-fighting is

obviously a dangerous job, but the firefighters can be expected to take whatever safety precautions that are possible.

For these reasons, the public interest supports the plaintiff's position.

## V.

The four factors considered in determining whether a preliminary injunction should issue moderately favor the plaintiff. That is sufficient since there is no requirement that the plaintiff make an overwhelming showing. Consequently, I recommend that the plaintiff's motion for a preliminary injunction be granted.

However, while REV Group and E-One referred to themselves collectively as the defendants in the opposition to the preliminary injunction (Doc. 44, p. 9), REV Group makes a specific argument that it cannot be liable for patent infringement because it did not make, use, sell, offer to sell, or import into the United States any accused product, including the Metro 100 Quint (id., pp. 20-21). The plaintiff did not make a contrary showing in its opening brief, and did not challenge REV Group's argument in its reply brief. Consequently, although REV Group will remain in the case, it should not be named in the preliminary injunction. Of course, since REV Group will have

knowledge of the preliminary injunction, if it acts in concert with E-One to violate it, REV Group can be held accountable.

Therefore, I recommend that E-One be enjoined from making, using, selling, and offering to sell fire apparatus that infringe U.S. Patent Nos. 9,597,536 and 9,814,915.[13]

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: JUNE 13, 2018

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.

---

[13]At the hearing, the parties wanted to defer consideration of the matter of a bond as required by Rule 65(c), F.R.Civ.P.