# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PIERCE MANUFACTURING INC. and
OSHKOSH CORPORATION,

    Plaintiffs,

v.

Case No.: 8:18-cv-617-JSM-TGW

E-ONE, INC. and REV GROUP, INC.,

    Defendants.

## DECLARATION OF JOSEPH F. RAKOW, Ph.D., P.E.

I, Joseph F. Rakow, Ph.D., P.E., declare as follows:

### I. INTRODUCTION AND QUALIFICATIONS

1. I have been retained on behalf of E-ONE, INC. and REV GROUP, INC. to provide this Declaration relevant to the above-referenced matter. I reserve the right to supplement this Declaration in response to additional evidence that becomes available to me.

2. I am over 18 years of age, I have personal knowledge of the facts stated in this Declaration, and I could testify competently to them if asked to do so.

3. My curriculum vitae is submitted herewith as **Exhibit B**.

4. I hold Ph.D. and M.S. degrees in aerospace engineering from the University of Michigan, and a B.S. in physics from the University of California, Davis. My graduate training and research focused on the mechanics and stability of structures and structural systems. For my dissertation, I designed, built, and tested a novel structure for hypersonic aircraft, in which my study focused on the stability of that structure under applied loads. During my time as a graduate researcher, I was also employed by the Department of Energy to conduct applied research on structural stability for a variety of national weapons systems.

5. I currently serve as a Principal Engineer and the Director of Exponent's Mechanical Engineering practice, where I have been consulting full time for the past 14 years. A significant portion of my practice has been dedicated to the development, performance, and failure of structures. This has spanned a wide range of products including aircraft, spacecraft, ground vehicles, sporting equipment, wind turbines, and civil structures. Products particularly relevant to the present matter include cranes, truck-mounted aerial lifts, and man-lifts.

1

6. I actively publish in scientific and industrial literature, and I am frequently invited to present at national and international technical conferences. I am also a Visiting Lecturer in the Aeronautics and Astronautics Department at Stanford University, where I regularly teach about failure analysis of advanced structures.

7. I am often called upon by the United States government to address technical issues involving structures. I teach courses on composite structures to the Department of Defense; I authored the chapter on composite structures for the International Civil Aviation Organization (ICAO) Manual of Accident and Incident Investigation; and I am a Working Group Chair for the Federal Aviation Administration in its CMH-17 organization, which develops standards for composite structures. In addition, for more than a decade I have served as a Structural Specialist with the Federal Emergency Management Agency (FEMA) Urban Search & Rescue, where I serve on a task force of firefighters deployed to disasters of national significance (e.g., earthquakes, hurricanes, and sites of terrorism). My responsibility as a Structural Specialist is to evaluate the stability of structures and equipment in the field to help ensure the safety of firefighters during rescue operations. Finally, I am a licensed professional engineer in both mechanical and civil engineering in the state of California.

8. I have been elected to the rank of Fellow in the American Society of Mechanical Engineers (ASME). Designation as a Fellow is in recognition of significant engineering achievements and contributions to the engineering profession. The designation is bestowed on approximately 3% of the organization's membership. ASME cited my structural work as a basis for this recognition.

9. My employer, Exponent, is being compensated at a rate of $520.00 per hour for my work on this matter in 2019. I am also being reimbursed for reasonable and customary expenses associated with my work in this investigation. No part of my compensation is contingent on the outcome of this matter; nor is it contingent on the specifics of my testimony.

10. I have testified in state and federal courts, and before international arbitration tribunals, as an engineering expert in matters involving structures and other mechanical systems. Over the past four years, I have testified in seven federal and state court depositions, three arbitration hearings, and one state court hearing.

## II. I HAVE BEEN INSTRUCTED ON THE LAW OF CLAIM INTERPRETATION AND ANTICIPATION

11. My opinion will concern U.S. Patent No. 9,597,536, with a filing date of November 24, 2016, a title ("QUINT CONFIGURATION FIRE APPARATUS"), and inventor Michael Moore. I will refer to this patent as "Moore" or "'536."

12. I have been instructed and understand that the '536 patent has patent claims, that the claims are numbered statements at the back of the patent, that the claims define the invention that the patent protects, and that each claim is to be considered in its own right relative to other claims on the matter for which I consider it.

2

1807913.000 - 3953

13. I have been instructed and understand that Moore is **Exhibit C** and is to be cited "M-" with additional page, line, and similar references to the specific portions referenced.

14. **Invalidity:**

    a) I have been informed and understand that in order to demonstrate invalidity of a patent claim based on anticipation under 35 U.S.C. § 102, there must be clear and convincing evidence that (1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention; or (2) the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention. 35 U.S.C. § 102(a).

    b) I have been informed and understand that if every element in a claim is found—expressly or inherently—in a single prior art reference, then the claim is anticipated and invalid.[1] This is also true even where the prior art reference did not appreciate or recognize the "inventive concept" of the invention claimed in the challenged patent. ("Our cases have consistently held that a reference may anticipate even when the relevant properties of the thing disclosed were not appreciated at the time.")[2]

15. I have read the Court's Claim Construction ruling (Dkt. No. 158), and I have applied the Court's constructions for my analysis and my opinion.

## III. CLAIM 20 OF THE '536 PATENT IS ANTICIPATED BY THE 2008 MODEL SPARTAN ROSENBAUER QUINT CONFIGURATION FIRE APPARATUS, A PRIOR ART INVENTION

### A. Overview of the 2008 Spartan Rosenbauer Quint Configuration Fire Apparatus and April 30, 2019, Inspection

16. Rosenbauer America, a producer of fire trucks and emergency response vehicles, produced a 2008 model quint configuration fire apparatus with VIN 4S7AV2P9680057561. This truck, also known as a Spartan Rosenbauer truck, will be referred to herein as the "SR Truck." As the SR truck was built and offered for sale in 2008, more than six years before the priority date of the '536 patent, it constitutes prior art.[3]

---

[1] See *Planet Bingo, LLC v. Gametech Int'l, Inc.*, 472 F.3d 1338, 1346 (Fed. Cir. 2006).
[2] *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 633 (Fed. Cir. 1987); see *also Abbott Labs. v. Baxter Pharm. Prods. Inc.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006).
[3] 35 U.S.C. § 102(a).

3

17. On April 30, 2019, I participated in an on-site inspection of the SR truck, located at the Rosenbauer Manufacturing Facility in Wyoming, Minnesota, henceforth "the inspection." At this inspection, I took photographs and dimensional measurements, and participated in a series of demonstrative experiments on the SR truck. Unless otherwise specified, each of the following photographs, measurements, and experimental results that I rely upon for my opinions comes from the April 30, 2019, inspection.

B. Analysis of Moore Claim 20 in View of The SR Truck Inspection

20a. "A quint configuration fire apparatus, comprising:"

18. During the inspection, the SR truck was observed to possess all of the components (under their plain and ordinary meaning) that would typically comprise a quint configuration (see Figure 1 and Figure 2): an aerial ladder, a water tank, ground ladder storage, a water pump, and hose storage. Indeed, this is consistent with how Moore construes the term "quint configuration" at e.g., M-1:19-21. Accordingly, the SR truck is an embodiment of "a quint configuration fire apparatus."

20b. "a chassis;"

19. In its claim construction ruling, the Court construed the term "chassis" to mean a structure composed of the combination of the engine, drivetrain, and frame: all three of these elements combining to represent "the chassis."

20. During the inspection, the SR truck was observed to have (under each term's plain and ordinary meaning) an engine, a drivetrain, and a frame that supports the truck (see Figure 3). Accordingly, the SR truck includes "a chassis."

 

Figure 1.   The Spartan Rosenbauer quint configuration fire truck (SR truck), inspected on April 30, 2019, in Wyoming, MN. The right-hand side image shows the plate found on the interior of the cab indicating its build date of 2008 (red square).

4

1807913.000 - 3953



Figure 2. **Claim 20a.** Annotated images of the SR truck showing its pump (top left), aerial and ground ladders (top right), water storage tank (bottom left), and hose storage compartment (bottom right).



Figure 3. **Claim 20b.** The observed components of the SR truck chassis, including an engine (shown here are the exhaust/muffler assembly associated with the engine), a frame, and a drivetrain.

5

1807913.000 - 3953

**20c.1. "a body assembly coupled to the chassis and"**

21. The SR truck (as inspected) literally includes a body assembly that is coupled to the chassis, under a reasonable interpretation of a body assembly (i.e., see Figure 4, left). Moreover, the body assembly is coupled to the chassis, as movement of the chassis induces movement of the body assembly.

22. Moore identifies a body assembly in '536 Figures 1–12 as the *"rear section 16, axles 18"* M-4:22 (see Figure 4). The definition of "body assembly" supplied by Moore is consistent with the body assembly as embodied by the SR truck (see Figure 4, right).

23. Accordingly, the SR truck includes a "body assembly coupled to the chassis."



Figure 4. **Claim 20c.1.** Annotated photo of the SR truck showing both the cab and body assemblies (left). Moore makes similar definitions in the '536 patent as shown in the annotated Figure 1 from Moore (right), where the red highlights indicate the body assembly as defined by Moore.

**20c.2. "having a storage area configured to receive a ground ladder and a fire hose"**

24. During the inspection, I also observed the SR truck to have a storage area on the rear of the truck that can receive a ground ladder and a fire hose. The storage area is contained within the body of the SR truck (Figure 5). Accordingly, the SR truck discloses "having a storage area configured to receive a ground ladder and a fire hose."

1807913.000 - 3953



Figure 5. **Claim 20c.2.** Annotated images of ladder and hose storage area on the SR truck. (A) Overall image of the rear of the quint. Storage area doors are labeled in green and blue dashed boxes. (B) Green storage area with doors open. (C) Blue storage area with doors open.

**20.d. a pump coupled to the chassis;**

25. During the inspection, I also observed that the SR truck included a pump, a pump housing, and controls for actuating the pump (see Figure 6). As the movement of the chassis of the SR truck induces movement of the pump, the SR truck includes "a pump coupled to the chassis."



Figure 6. **Claims 20.d. and 20.e.** Annotated photographs of the controls for the SR truck water pump (left) as well as the fill point of the water tank from which the pump draws water (right).

7

1807913.000 - 3953

**20.e. "a water tank coupled to the chassis;"**

26. During the inspection of the SR truck, I observed a fill point of the water tank (shown in Figure 6). As the water tank itself was integrated into the body of the truck (the body of the truck being supported by the frame of the truck and the frame being an integral part of the chassis), the water tank of the SR truck is therefore coupled to the chassis. Accordingly, the SR truck includes "a water tank coupled to the chassis."

**20.f.1. "a ladder assembly including a plurality of extensible ladder sections,"**

27. During the inspection, I observed the SR truck to include a ladder assembly, with this assembly having four extensible ladder sections (see Figure 7). Accordingly, the SR truck includes "a ladder assembly including a plurality of extensible ladder sections."



Figure 7. **Claim 20.f.** The ladder assembly of the SR truck in a retracted configuration (left), and an extended configuration (center). The right figure shows the proximal end of the ladder assembly coupled to the chassis of the SR truck via a turntable.

**20.f.2. "the ladder assembly having a proximal end that is coupled to the chassis;"**

28. During the inspection of the SR truck, I observed the aforementioned ladder assembly containing a proximal end, this proximal end anchored to a rotating structure (turntable) (see Figure 7). As movement of the chassis of the SR truck induces movement of the proximal end of the ladder assembly, the ladder assembly proximal end is coupled to the chassis of the SR truck. Accordingly, the SR truck includes a "ladder assembly having a proximal end that is coupled to the chassis."

8

**20.g. "a single front axle coupled to a front end of the chassis;"**

29. During the inspection of the SR truck, I observed that the truck included a single front axle (see Figure 8). As this axle, by its functional nature, is connected to the front end of the frame of the SR truck (which is an integral part of the chassis), the front axle is coupled to the front end of the chassis. Accordingly, the SR truck includes "a single front axle coupled to a front end of the chassis."

 

Figure 8. **Claims 20.g and 20.h.** The single front (left) and single rear (right) axles of the SR truck.

**20.h.1 "and a single rear axle coupled to a rear end of the chassis,"**

30. During the inspection of the SR truck, I observed that the truck included a single rear axle (see Figure 8). As this axle, by its functional nature, is connected to the rear end of the drivetrain of the SR truck (which is an integral part of the chassis), the rear axle is therefore coupled to the rear end of the chassis. Accordingly, the SR truck includes "a single rear axle coupled to a rear end of the chassis."

**20.h.2 "wherein the single rear axle comprises either: a single solid axle configuration extending laterally across the chassis, or a first axle having a first constant velocity joint and a second axle having a second constant velocity joint, the first axle and the second axle extending from opposing lateral sides of a differential;"**

31. The aforementioned single rear axle was observed during the inspection to extend laterally between rear wheel hubs, connecting the main drive shaft (chassis) to the wheels. Accordingly, the SR truck includes "a single solid axle configuration extending laterally across the chassis."

**20.i.1. "wherein the ladder assembly is extensible to provide a horizontal reach of at least 90 feet and a vertical height of at least 95 feet,"**

9

32. The horizontal reach of the ladder assembly was measured during the inspection. The ladder was extended horizontally (see Figure 9A) and a tape measure was used to quantify the horizontal distance from the center of rotation of the ladder's turntable to the distal rung of the ladder (see Figure 9 B and C), measuring a distance of approximately 90.3 feet.



Figure 9. **Claim 20.i.** Measuring the horizontal and vertical reach of the SR truck ladder. The ladder was extended horizontally (A), and the distance from the center of rotation of the ladder assembly turntable (B) was measured to the distal rung of the ladder assembly (C). A zoomed-in perspective of photo C, indicating a measured distance of greater than 90 feet. The ladder was extended vertically, and the distance from the distal end of the ladder assembly to the ground was measured (D, E), indicating a distance greater than 95 feet.

10

1807913.000 - 3953

Case 8:18-cv-00617-JSM-TGW Document 251-1 Filed 10/30/19 Page 12 of 16 PageID 14564

33. To measure the vertical height of the ladder assembly, a tape measure was affixed to the most distal rung of the ladder. The ladder was then extended and raised such that the proximal end of the tape measure was held to the ground (see Figure 9 D, E). The vertical height of the extended ladder assembly was observed to extend approximately 99.7 feet (see Figure 9 E).

34. Accordingly, in the SR truck, "the ladder assembly is extensible to provide a horizontal reach of at least 90 feet and a vertical height of at least 95 feet."

> 20.i.2. "wherein the ladder assembly is configured to support a tip load of at least 750 pounds and wherein the center of gravity of at least one of the chassis, the body assembly, the pump, and the water tank are positioned to counterbalance a moment generated by the tip load with the ladder assembly extended to the horizontal reach of at least 90 feet."

35. During the inspection, a series of measurements were captured to determine if the SR truck's ladder assembly is configured to support a tip load of 750 pounds with the ladder extended to the horizontal reach of at least 90 feet.

36. As the ladder assembly is extended horizontally and placed under load, the ladder will deflect and curve, causing the horizontal reach of the ladder to shorten slightly. To acquire an accurate measurement of the horizontal reach in this configuration, the proximal and distal endpoints of the horizontal measurement were marked on the ground, rather than on the (curved) ladder.

37. To mark the proximal endpoint of the horizontal measurement, a straightedge was placed against brackets that kept the straightedge aligned with the center of rotation of the turntable and perpendicular to the length of the ladder (see Figure 10 A). A plumb bob was hung from the straightedge (see Figure 10 B, C), and a mark was made on the ground (see Figure 10 D). This mark defined the proximal endpoint of the horizontal length measurement.

38. In a similar fashion, the distal endpoint of the measurement was then located. A straightedge and plumb bob were used to transfer the location of the ladder's most distal rung to the pavement (see Figure 11 A–C).

39. A test load was weighed using a calibrated scale and was measured to be 750 pounds (see Figure 12).

40. The load of 750 pounds was applied to the ladder at the location of the most distal rung. With the load applied, the ladder's horizontal reach was measured between proximal endpoint and the plumb bob mounted on the straightedge at the distal rung, and the distance was confirmed to be greater than 90 feet (see Figure 13).

41. The ladder assembly was not observed to undergo any permanent deformation, and the ladder assembly retracted smoothly upon removal of the load.

42. The SR truck did not exhibit any tipping during the 750 pound load test.

1807913.000 - 3953



Figure 10. **Claim 20.i.** Annotated photographs documenting the transfer of the proximal endpoint to the ground. (A) A straightedge was aligned with the center of rotation of the turntable and butted against brackets that kept it perpendicular to the ladder's length. (B, C) A plumb bob was hung from the straightedge. (D) The plumb bob's location was then marked on the ground.



Figure 11. **Claim 20.i.** Annotated photographs documenting the marking on the ground of the distal rung location. (A) A plumb bob was hung from the center location of the most distal rung of the ladder. (B) A zoomed-in photograph of the plumb bob aligned with the center of the distal rung. (C) The location of the plumb bob was marked on the ground.

12



Figure 12.  **Claim 20.i.** Weighing the test load. The load was placed on a calibrated scale and observed to weigh 750 pounds.



Figure 13.  **Claim 20.i.** Photographs documenting the 750 pound load test. A straightedge was mounted perpendicular to the length of the ladder, and a plumb bob was hung from the center of the distal rung (left). Then the 750 pound load from Figure 12 was applied to the distal rung of the ladder. With the load applied, the horizontal distance between the distal rung and the proximal end of the ladder was confirmed to be greater than 90 feet (approximately 90.7 feet).

13

1807913.000 - 3953

43. In the tested configuration—with the ladder extended horizontally off the rear of the truck—the fulcrum for tipping is the aft outriggers, and the applied load is located aft of this fulcrum. The center of gravity of at least one of the chassis, the body assembly, the pump, and the water tank is positioned forward of the aft outriggers, counterbalancing the moment generated by the applied load (see Figure 14). Accordingly, in the SR truck, "the ladder assembly is configured to support a tip load of at least 750 pounds and wherein the center of gravity of at least one of the chassis, the body assembly, the pump, and the water tank are positioned to counterbalance a moment generated by the tip load with the ladder assembly extended to the horizontal reach of at least 90 feet."



Figure 14. **Claim 20.i.** Annotated photograph showing the fulcrum location to be at the rear outrigger when the ladder assembly is extended to the rear of the SR truck. The tip load is applied to the left of the fulcrum in this image, whereas the center of gravity of at least one of the chassis, the body assembly, the pump, and the water tank is located to the right of the fulcrum. Therefore, the center of gravity of at least one of the chassis, the body assembly, the pump, and the water tank is positioned to counterbalance a moment generated by a tip load with the ladder assembly extended to a horizontal reach of at least 90 feet.

44. As described in this declaration, I have observed that the SR truck literally includes every limitation of Claim 20 of the '536 patent. The SR truck was offered for sale in 2008 (at least six years before the priority date of the '536 patent), qualifying it as prior art under 35 U.S.C. § 102(a). Because of these facts, it is my opinion that Claim 20 of U.S. Patent No. 9,597,536 was anticipated by the SR truck and should be rendered invalid.

14

1807913.000 - 3953

## IV. DECLARATION

45. I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed on May 30, 2019.

Joseph F. Rakow, Ph.D., P.E.